445 So.2d 1330 (1984)
PEARL RIVER VALLEY WATER SUPPLY DISTRICT, et al.
v.
HINDS COUNTY, et al.
No. 54387.
Supreme Court of Mississippi.
January 25, 1984.
*1331 William N. Reed, Neil P. Olack, J. Brad Pigott, Watkins, Ludlam & Stennis, Jackson, for appellants.
Natie P. Caraway, David W. Clark, Wise, Carter, Child & Caraway, Jackson, Robert Brooks, Barnett & Brooks, Carthage, for appellees.
EN BANC.
WALKER, Presiding Justice, for the court:
Hinds County, Leake County and Roger Stewart, appellees and cross-appellants, hereinafter referred to as Hinds County, et al., initiated this action by bill of complaint, as amended, seeking an injunction, accounting and return of funds against the Pearl River Valley Water Supply District, et al.

BACKGROUND
On August 20, 1982, the Chancery Court of the First Judicial District of Hinds County entered its final judgment, permanently enjoining the Pearl River Valley Water Supply District from using any State ad valorem tax proceeds diverted to the District by Mississippi Code Annotated section 51-9-131 (1972) for any purpose other than paying, prepaying, redeeming or retiring bonds. The court also permanently enjoined the District from making a special levy under Mississippi Code Annotated section 51-9-139 (1972) in any year that the State ad valorem taxes paid to the District exceed the amount of the District's debt service.
The Pearl River Valley Water Supply District was created in 1958 with the Legislature's passage of the Pearl River Valley Water Supply District Law,[1] Mississippi Code Annotated section 51-9-101, et seq. The District was formally established through petition to the Chancery Court of Hinds County. The voters of five counties  Hinds, Leake, Rankin, Madison and Scott  elected to make their counties members of the District.
The District is an agency of the State. Miss. Code Ann. § 51-9-105 (1972). Its powers are prescribed by statute, Mississippi Code Annotated section 51-9-121 (1972), and exercised by a board of directors, Mississippi Code Annotated section 51-9-107 (Supp. 1982). Although it is an agency of the State, the District does not receive an appropriation of money by the Legislature from the general fund of the State.
Mississippi Code Annotated section 51-9-133 (1972) authorized and empowered the District to issue bonds of the District for the purpose of paying the costs of acquiring, owning, constructing, operating, repairing, and maintaining the project.
Since construction of the reservoir was completed, the expenses of the District, including debt service on the bonds, i.e., interest and principal, have been defrayed by the following revenues, according to the District records:
(1) The avails of two mills of the State ad valorem tax collected in each of the five-member counties (State levy);
(2) The avails of a special tax levy by the District board on property in the five-member counties in an amount not to exceed two mills (the special levy);
(3) Real estate development and lease payments;
(4) Camping, garbage, water and sewer, and miscellaneous fees;
(5) Interest on investments; and
*1332 (6) Contractual payments by the City of Jackson.
In its brief, the District acknowledges that the proceeds of the special tax, i.e., the special tax levy cannot be used to pay operation and maintenance expenses of the District. The District also acknowledges that in the past, the proceeds from the State levy and the other revenues mentioned above have been used first to pay operation and maintenance expenses with the balance being applied toward payment of debt service on the bonds. Hinds County, et al object to this method and contend that the State levy tax proceeds can only be used for retirement of the District's bonded indebtedness.
As late as 1968, the District's budgeted revenue from the full State levy and full special levy exceeded the District's bond cost, i.e., principal and interest payments, by only about $5,800.00. However, the revenues to the District from the State's two-mill levy have been increasing steadily and in 1982 were projected to yield $1,470,000.00. By the year 1981, the revenues from the State's two-mill levy alone were sufficient to service the District's annual bond cost which is a relatively constant amount. For fiscal year 1983, the District anticipated that the revenues from the State two-mill levy alone, would exceed annual bond charges by $187,500.00.
The residential lessee population of the District by 1981 was approximately 5,000, and the District's "operation and maintenance" expenditures increased dramatically from $622,455.03 in 1972 to an estimate of $2,687,500.00 in 1982. A large portion of the District's budget during this period was spent furnishing services for the residential population, including utility service, police protection, fire protection, and street maintenance. Of these services furnished by the District to the lessees, there was no charge for the police protection, the fire protection, or the road and street maintenance. For many years the District provided free garbage pickup. The District has not charged the lessees for the police protection or for the road and street maintenance even though those lessees agreed, in their leases, to pay their pro-rata share of the cost of such services. The law provides for such charges; and it is patently unfair for the District's five-member counties to bear this burden. Miss. Code Ann. § 51-9-121(t).
The amount by which the District's "operation and maintenance" expenditures have exceeded receipts from the residential and commercial "lease rental" payments has grown from $417,464.16 in 1972, to $747,435.00 in 1976, to $1,651,482.00 in 1980, to a projected $2,558,000.00 in 1983.
Studies commissioned by the District revealed that with the escalating "operation and maintenance"[2] cost of the District and the leases executed by the District, that even when the District is fully developed, its revenues from the annual "lease rental" payments will pay only about one-half of the "operation and maintenance" expense of the District. It is evident that the District will never be self-sustaining if expenditures are not brought under control.

BILL OF COMPLAINT
Hinds County, et al's bill of complaint, as amended, had five separate counts, only two of which are pertinent to this opinion.
In Count I, Hinds County, et al charged that under the Pearl River Valley Water Supply District Law, Mississippi Code Annotated sections 51-9-101 et seq, the proceeds of the State two-mill levy (section 51-9-131) are required to be used solely for the purpose of paying bonds or the costs of bonds issued pursuant to the District Law. They further contended that the amount received annually by the defendant-appellant Pearl River Valley Water Supply District under such State levy exceeded the District's annual bond costs, that no special levy under section 51-9-139 could be properly imposed, and that the District may *1333 apply the excess State levy revenues only to prepay bonds.
In Count II, Hinds County, et al contended that in making the determination of whether a special levy under section 51-9-139 was "necessary," and could thus be imposed, the District had not been giving Hinds County, or the other taxpayers of member counties, credit for substantial revenues, projected revenues and funds which were coming to the District or were available to the District, all in violation of the District Law and particularly of section 51-9-139.

CHANCERY COURT'S DECREE
After hearing the matter on the merits, the chancellor entered the court's final decree, which provided in pertinent part as follows:
"(1) That defendant Pearl River Valley Water Supply District is permanently enjoined, effective November 1, 1982, from using any funds paid to such District by Hinds County or Leake County by virtue of Mississippi Code Section 51-9-131 for any purpose or use other than paying, prepaying, redeeming or retiring the bonds issued under the Water Supply District Law;
(2) That defendant Pearl River Valley Water Supply District be and hereby is permanently enjoined from making any further special levy or special levy request as authorized by Section 51-9-139 so long as the revenue of the two mills levy under Section 51-9-131 is equal to or exceeds the amount needed to pay the principal of, interest on and costs of the bonds issued under the Water Supply District Law; ... ."

ASSIGNMENT OF ERROR AND LAW
The appellants, Pearl River Valley Water Supply District, et al have assigned, inter alia, that the chancellor erred in his construction of Mississippi Code Annotated section 51-9-131 and related provisions of the Pearl River Valley Water Supply Act. In making his ruling, the chancellor placed much stress on the wording of section 51-9-131 saying:
Section 51-9-131 is composed of only one short statement. It states two mills payable on or before February 1, 1961, and so long as any bonds issued hereunder are outstanding, the tax collector of said county shall pay into the depository selected by the said water district ... it goes on to state that the levy shall continue at not less than two mills on each county in the district so long as any bonds issued pursuant to this article remain outstanding. (Emphasis theirs).
It is clear to this Court that the intent of the Legislature was that the State levy of two mills would be used only for the payment of the principal of, interest on, and other charges in connection with said bonds. Likewise, the tax collector of the member counties was directed to pay said levy to the district for the purpose of paying off the bonds.
The Legislature then provided a safeguard by providing in Section 51-9-139 that in the event additional funds were needed in connection with the bonds, they might be raised by the special tax not to exceed two mills. The Defendants concede that this special tax can only be used for bond payments.
Significant to this Court is the language of Section 51-9-133, supra. This section states, inter alia, that the district is authorized to issue bonds for the purpose of paying the costs of acquiring, owning, constructing, operating, repairing, and maintaining the district. This section makes it clear the bonds shall not constitute general obligation bonds and provides that the said bonds shall be secured by three sources:
(A) A pledge of the net revenue,
(B) the two mills provided in Section 51-9-131, and
(C) The special tax provided in Section 51-9-139.
Defendants argue that if the Legislature had intended to restrict the two mill state levy authorized in Section 51-9-131, it would have done so. As stated above, this Court is of the opinion that the Legislature did just that when the two mills *1334 of all ad valorem taxes due by the member county was tied directly to the life of the bonds. It is inconceivable to this Court, as contended by Defendants, that the Legislature intended that the district might use this two mill levy for any purpose. Such a construction would say to the district, "You are not required to use any of the two mills from the five counties to pay bonds but may continue to use same for operation and maintenance."
We are of the opinion that the learned chancellor erred in his construction of section 51-9-131. The Pearl River Valley Water Supply District Law is a comprehensive act of the legislature and the legislative intent must be determined from the total language of the act and not from one section thereof considered apart from the remainder. McCluskey v. Thompson, 363 So.2d 256, 259 (Miss. 1978), citing Brady v. John Hancock Mutual Life Insurance Co., 342 So.2d 295 (Miss. 1977), appeal dismissed, 434 U.S. 804, 98 S.Ct. 32, 54 L.Ed.2d 61 (1977); Miss. Public Service Commission v. City of Jackson, 328 So.2d 656 (Miss. 1976) and Akers v. Johnson's Estate, 236 So.2d 437 (Miss. 1970). Additionally, the words of a statute or act should be ascribed their ordinary and usual meaning. Brady v. John Hancock Mutual Life Insurance Co., supra at 298; Entrican v. King, 289 So.2d 913, 917 (Miss. 1974).
With these rules of construction in mind, we find it necessary to refer to several relevant statutes in the Pearl River Valley Water Supply District Law in order to determine the intent of the legislature.
First, Mississippi Code Annotated section 51-9-103 (1972) is a declaration of legislative policy with reference to the creation of the Pearl River Valley Water Supply District. That section states in part:

It is further determined and declared that the preservation, conservation, storage, and control of the waters of the Pearl River and its tributaries and its overflow waters for domestic, municipal, commercial, industrial, agricultural, and manufacturing purposes, for recreational uses, for flood control, timber development, irrigation, and pollution abatement are, as a matter of public policy, for the general welfare of the entire people of the state. (emphasis added).
That section goes on to provide in part: "All the terms and provisions of this article are to be liberally construed to effectuate the purposes herein set forth, this being a remedial law."
Mississippi Code Annotated section 51-9-159 (1972) made provisions for the District to acquire preliminary expenses prior to issuance of any bonds. That section reads:
Any municipality or county which is within the territorial limits of the district may advance funds to said district to pay the preliminary expenses, including engineers' reports, organization, or administration expenses ... [and] The Board of directors is hereby authorized to repay any such advances from the proceeds of any bonds issued under the provisions of this article.
By this statute, it is evident that the legislature contemplated that the District would begin operation and have expenses prior to the issuance of any bonds or receiving any monies from tax levies. It was, therefore, a foregone conclusion that bonds would be issued and the Pearl River Valley Water Supply District would be in operation prior to February 1, 1961. This explains the provision in section 51-9-131 relied on so heavily by the chancellor, which states: "... beginning with the ad valorem tax assessment for the calendar year 1960, payable on or before February 1, 1961, and so long as any bonds issued hereunder are outstanding,[3] the tax collector of said county shall pay into the depository selected by said water district for said purpose the amount of two mills of all ad *1335 valorem taxes due by said county to the State of Mississippi...."
After preliminary studies and plans were made for construction of the reservoir, the first bonds authorized by section 51-9-133 were issued and construction began.
The part of the Pearl River Valley Water Supply District Law authorizing the issuance of bonds is section 51-9-133 and is dispositive of the question before us. It provides as follows:

The board of directors of the district is hereby authorized and empowered to issue bonds of the district for the purpose of paying the costs of acquiring, owning, constructing, operating, repairing, and maintaining the projects and works specified herein, including related facilities, and including all financing and financial advisory charges, interest during construction, engineering, legal, and other expenses incidental to and necessary for the foregoing, or for the carrying out of any power conferred by this article. Said board of directors is authorized and empowered to issue such bonds at such times and in such amounts as shall be provided for by resolution of the said board of directors, not to exceed the limitation prescribed in section 51-9-137. All such bonds so issued by said district shall be secured solely by a pledge of the net revenues which may now or hereafter come to the district, by the pledge of the avails of the two mill ad valorem tax levy provided for in section 51-9-131, and by the pledge of the special tax levy of two mills provided for in section 51-9-139; and such bonds shall not constitute general obligations of the State of Mississippi or of the counties comprising said district, and shall not be secured by a pledge of the full faith, credit, and resources of said state or of said counties. Bonds of the district shall not be included in computing any present or future debt limit of any county in such district under any present or future law. "Revenues" as used in this article shall mean all charges, rentals, tolls, rates, gifts, grants, tax proceeds, moneys, and all other funds coming into the possession of the district by virtue of the provisions of this article, except the proceeds from the sale of bonds issued hereunder. "Net revenues" as used in this article shall mean the revenues after payment of costs and expenses of operation and maintenance of the project and related facilities. (emphasis added).
Said section first authorized the issuance of bonds by the district for the purpose of paying costs of acquiring, owning, constructing, operating, repairing, and maintaining the projects and works specified, including related facilities, and including all financing and financial advisory charges, interest during construction, engineering, legal, and other expenses incidental and necessary thereto as well as for the carrying out of any power conferred by the Pearl River Valley Water Supply District Law. It then provided that "All such bonds so issued by said district shall be secured solely by a pledge of the net revenues which may now or hereafter come to the district, by the pledge of the avails of the two mill ad valorem tax levy provided for in section 51-9-131, and by the pledge of the special tax levy of two mills provided for in section 51-9-139... ." The statute went on to define "Revenues" to mean all charges, rentals, tolls, rates, gifts, grants, tax proceeds, moneys, and all other funds coming into the possession of the District, except the proceeds from the sale of bonds. "Net revenues" was defined in the statute as "the revenues after payment of costs and expenses of operation and maintenance[4] of the project and related facilities."
It is therefore clear from a study of the above statutes that the legislature contemplated that there would be expenses of operation and maintenance of the District other than the expenses of paying interest *1336 on and retiring the bonds, and that these expenses would have to be first met if the purpose of the District Law was to be accomplished. Therefore, if, as conceded by all parties, the wording of section 51-9-139 precludes the use of the avails of the "special levy" provided for under that section from being used for any purpose except for the retirement of bonds when necessary, there would remain all other funds[5] coming into the possession of the District from whatever source, including the tax proceeds from the "State levy." From those funds, the statute (section 51-9-133) contemplates that there would first be deducted the payment of costs and expenses of operation and maintenance of the project and related facilities with the balance being applied to the retirement of the bonds. In the event there was not a sufficient amount remaining to pay the cost of interest and bond retirement in a given year, then and only then, the board of directors has the authority under section 51-9-139 to assess the additional "special levy" of not more than two mills to also be applied toward the retirement of bonds.
When all of the funds coming into the District are properly applied, there may or may not be a need for the special two-mill levy provided for under section 51-9-139, but, that question is not now before us.
We are of the opinion that the learned chancellor erred in issuing the injunction. Therefore, for the reasons set out above, the judgment of the chancery court enjoining the Pearl River Valley Water Supply District from using funds paid to the District by Hinds County and Leake County as required by section 51-9-131 (State levy) for any purpose or use other than paying, prepaying, redeeming, or retiring the bonds issued by the District, and from using any of the special levy funds authorized by section 51-9-139 (special levy) when the revenue from the two-mill levy provided for under section 51-9-131 is equal to or exceeds the amount needed to pay the interest on and costs of the bonds issued pursuant to the District Law; and, assessing attorney's fees in the sum of $70,204.28 against the District should be reversed without prejudice.

CROSS-APPEAL
On cross-appeal we are unable to say that the chancellor was manifestly wrong in not ordering a full accounting and in not awarding damages to Hinds County et al., the appellees. However, we are of the opinion that this cause should be remanded to the chancery court for further hearings, if necessary, with reference to Count IV of the amended bill of complaint in which it is alleged as follows:
Regardless of which tax revenues the Water Supply District has used to make the annual bond payments  whether some of the Section 51-9-131 funds or some of the Section 51-9-139 funds  at least a substantial portion of the remaining tax revenues received by the Water Supply District have been and continue to be used by the defendants for purposes which are not authorized by the Water Supply District Law, which the Water Supply District does not have the power to perform or fulfill, which other political subdivisions have a duty to perform or fulfill, or which the Water Supply District has no legal or moral obligation to perform or fulfill. Furthermore, the Water Supply District has used such *1337 remaining tax funds for items and services which are not necessary to the fulfillment of the purposes and functions of the Water Supply District as set forth in the Water Supply District Law.
If the court finds that the Water Supply District is using District funds for purposes which are not authorized by the Water Supply District Law, or which the Water Supply District does not have the power to perform or fulfill, or which other political subdivisions have a duty to perform or fulfill, or which the Water Supply District has no legal or moral obligation to perform or fulfill or which are not necessary to the fulfillment of the purposes and functions of the Water Supply District as set forth in the Water Supply District Law and which are not discretionary functions of the District, the court should enter a decree incorporating its findings with regard thereto and enjoin the District and its officers and directors from any future violations with respect to said specific findings.
If the court should find that the District has violated the District Laws or exceeded its authority and enjoins the District from future violations, then, in that event, the court may award attorney's fees to cross-appellants that seem just and proper under the circumstances.
The judgment of the chancery court on direct appeal is reversed and injunctions dissolved without prejudice.
On cross-appeal this cause is remanded for further proceedings not inconsistent with this opinion.
REVERSED ON DIRECT APPEAL AND INJUNCTIONS DISSOLVED WITHOUT PREJUDICE:
All Justices participating concur.
REMANDED ON CROSS APPEAL FOR FURTHER PROCEEDINGS:
All Justices participating concur.
ON DENIAL OF ATTORNEYS' FEES AND ON DENIAL OF FULL ACCOUNTING:
PATTERSON, C.J., BROOM, P.J., and ROY NOBLE LEE, J., concur.
BOWLING, HAWKINS, PRATHER and ROBERTSON, JJ., dissent.
DAN M. LEE, J., not participating.
ROY NOBLE LEE, Justice, concurring:
I emphatically agree that the Legislature contemplated there would be expenses of operation and maintenance of the Pearl River Valley Water Supply District [District] and that under Mississippi Code Annotated § 51-9-133 (1972) there would first be deducted the payment of costs and expenses of operation and maintenance of the project and related facilities with the balance being applied to the retirement of the bonds; that in the event there was not a sufficient amount remaining to pay the cost of interest and bond retirement in a given year, then and only then, the Board of Directors has the authority under Mississippi Code Annotated § 51-9-139 (1972) to assess the additional special levy of not more than two (2) mills to be applied toward the retirement of the bonds; and that when all of the funds coming into the district are properly applied, there may or may not be a need for the special two-mill levy provided under § 51-9-139. I further agree that the decree of the lower court enjoining the District, effective November 1, 1982, from using any funds paid to such district by Hinds County or Leake County by virtue of Mississippi Code Annotated § 51-9-131 (1972) for any purpose of use other than paying, prepaying, redeeming or retiring the bonds issued under the Water Supply District Law, should be dissolved and the case reversed thereasto.
The majority opinion sets out broad and general references to unauthorized expenditures made by the District. The dissent refers to specific instances of such unauthorized expenditures. Nowhere does the majority opinion justify or excuse such unauthorized expenditures. The record indicates that subsequent to 1961, and particularly from 1967 until the present time, revenues of the District have steadily increased, aggregating enormous amounts, *1338 and that there have been corresponding tremendous increases in expenditures by the District for purposes not contemplated or authorized by the statute. It is obvious that the people living within the five counties comprising the District have been uninformed as to the authority of the District in making expenditures. Otherwise, surely there would have been a cry for relief.
Those people and agencies in positions of authority, who should have been acquainted with what was happening, for some reason took no action to alleviate the situation. Hinds and Leake Counties finally came to the forefront with the action sub judice. However, with the situation having existed for so long a period of time, I agree that the judgment should be affirmed as to an accounting prior to August 20, 1982, the date of the lower court decree. Otherwise, in my view, havoc would prevail in the District. Subsequent to that date, there should be an accounting for all funds expended without authority.
In its final judgment, the lower court permanently enjoined the District from using any funds paid to it by Hinds County or Leake County by virtue of § 51-9-131 for any purpose or use other than paying, prepaying, redeeming or retiring the bonds issued under the Water Supply District Law. That injunction obviated, in the lower court's judgment, the necessity of further enjoining the District from using any of such funds not authorized by law, which relief was specifically sought by the appellees.
The appellees cross-appealed the refusal of the lower court to order an accounting and the failure to enjoin using any funds received from appellees, which use was not authorized by law. I agree that the cause as to such injunction should be remanded to the lower court for further proceedings consistent with the opinion. Such relief could be beneficial to the District because legal precedent has established that members of boards and governing bodies, who disburse and spend money for unauthorized purposes, may become personally liable for their actions.
Since the attorneys for the appellees have rendered valuable services not only to appellees, but to all the people and counties of the District, this issue should be considered again on remand.
For the reasons stated, I concur with the majority opinion.
PATTERSON, C.J., and WALKER and BROOM, P.JJ., concur.
PRATHER and ROBERTSON, JJ., would order a full accounting. Inasmuch as only four Justices have voted to order a full accounting, PRATHER and ROBERTSON, JJ., concur insofar as on cross-appeal this opinion would order an accounting from and after August 20, 1982.
HAWKINS, Justice, concurring as to reversal of direct and cross appeals, and dissenting as to the remainder:
I concur only as to the reversal of the direct and cross-appeals, and respectfully dissent on the remaining conclusions.
The above opinion follows a dissenting opinion heretofore filed in which I set forth my views at tedious length.[1]
I agree the direct appeal should be reversed, but remanded on the injunction to be granted the plaintiffs as set forth in the original dissenting opinion, and not reversed and rendered.
I would affirm the Chancellor's award of attorney's fees.
I agree the cross-appeal should be reversed, but in order for the Chancellor to require a meaningful accounting, not to require the Chancellor to conduct another hearing on the issue of whether or not an injunction should issue in the first place.
While I sincerely applaud the above opinion's not shutting the courtroom door on the plaintiffs, it still remains far short of the relief this record demonstrates the plaintiffs are entitled to, and which under *1339 well-settled principles of law we are obligated to grant.
Because there is nothing in the foregoing opinions which alters anything I stated in the original dissenting opinion, and I simply lack the time to structure another opinion around what is stated in the above opinions, the original dissenting opinion is attached as an appendix and made a part of this opinion.

INJUNCTIVE RELIEF
After stating the District's officers have spent money for purposes not authorized by law, and noting a "patently unfair" tax subsidy to the residential lessee-homeowners, the majority concludes that on remand  not of the direct appeal, but the cross-appeal  "... if the Chancellor finds the District is using funds for purposes not authorized by law ..." he should enter a decree making such findings and grant injunctive relief. The Chancellor and this Court manifestly have before us enough evidence now to entitle the plaintiffs to present injunctive relief. The only question should be the extent of the injunction. It should not take another trial and still another appeal to this Court to ascertain whether or not any injunctive relief is appropriate. As noted in the original dissenting opinion, the framing of the injunction should be in the Chancellor's discretion, within the framework and guidelines which I feel this Court is obligated to set forth. The duration of such injunction would also be within the Chancellor's discretion.
What has transpired in the management of the District's affairs is really mind boggling, as I attempted to heretofore state. The facts before us not only authorize, but demand we state injunctive relief is appropriate.
The above opinion evinces an uncalled for diffidence towards and deference for the officers and directors of the District. We should not leave the Chancellor dangling on remand as to how we view injunctive relief.
My views as to the injunction, and what should be the guidelines for the Chancellor on remand, are set forth in the original dissenting opinion.

ATTORNEY'S FEES
I would affirm the Chancellor's award of attorney's fees, as set forth in the original dissenting opinion. For the reasons therein stated, the plaintiffs are entitled to attorney's fees now. This question should not again be presented to the Chancellor for his determination.

ACCOUNTING
The majority opinion would require no accounting, the special concurring opinion an accounting only since August 20, 1982.
I would remand with directions to the Chancellor to require an accounting as set forth in the original dissenting opinion. Perhaps a word or two more on the accounting will be in order.
I did not in the original dissenting opinion attempt to give detailed directions to the Chancellor as to the accounting to be required of the District. It is his responsibility to frame the accounting order in a meaningful way. It very well could be subject to amendment from time to time, but it should require full disclosure. When one considers that over $20,000,000 of these five counties and Jackson's tax money has been spent over and above retirement of bonds, it should require no argument plaintiffs are entitled to specific answers.
I find the view that such an accounting will cause substantial problems to the District's officers unpersuasive. If adequate records have been kept, an accounting is the simplest thing in the world to render. My experience has been that it is only when the reverse is true that requests for accountings meet with strenuous objections. Now is the time for answers in this case, not eternal, forever unanswered questions. It is abhorrent to me that an accounting should be limited to August 20, 1982. If that were the best I could do, I *1340 believe I would simply deny any accounting altogether.
This Court needs to:
(1) In clarion language express our strong disapprobation of the management of the affairs of the District, as shown in the trial record of this case.
(2) Remand this case with directions to the Chancellor to determine tax dollars which have been spent on purposes not authorized by law, and by court injunction require that the District's financial affairs be put in order, and its officers and manager comply with the law.
(3) Award attorney's fees now.
As I view it, the majority and special concurring opinions, while recognizing faulty management, afford only a gingerly, timid relief that could well keep the District's affairs unsettled for years to come.
The views I advance may appear strong medicine, but the patient needs it now. With such catharsis the patient may recover, and not remain chronically ill for years to come.
I can only respectfully suggest, perhaps with boring repetition, that if this case does not warrant relief by way of injunction and a meaningful accounting, there can be no case warranting such relief.
BOWLING, PRATHER and ROBERTSON, JJ., join this opinion.

APPENDIX
HAWKINS, Justice, dissenting:
I respectfully dissent.
This is an appeal from a suit of the boards of supervisors of Hinds and Leake counties against the Pearl River Valley Water Supply District and its president in the Chancery Court of the First Judicial District of Hinds County.
In this suit the counties alleged the District was only authorized to use the monies derived from tax levies from five counties comprising the District, to retire the bonded indebtedness of the District, and that it had been, and was continuing, to use the monies for other purposes not authorized by law.
The counties also charged the District had been, and was continuing, to spend the money for purposes not authorized by law and "which the Water Supply District has no legal or moral obligation to perform or fulfill."
In their prayer for relief the counties first asked for an injunction enjoining the District from using tax monies for any purpose except retirement of the bonded indebtedness. The counties then asked, in the event the court did not restrict the expenditures of the tax revenues specifically to paying off the bonds, then in the alternative the court would enjoin the District from expending any tax revenues for any purpose not authorized by law.
The counties also asked for an accounting from the District, a return of all revenues expended for purposes not authorized by law, attorney's fees, and finally, prayed for general relief.
At the conclusion of the suit, the Chancellor found the District was only authorized to spend tax revenues for retirement of the bonds, and entered a final decree restricting the use of tax levies to this purpose.
It is thus clear the Chancellor never reached the alternative prayer for relief: for an injunction against expenditures not authorized by law, never considering it necessary to address this question.
The Chancellor also declined to order a return of tax monies to the District, stating:
While this Court has held that the entire two mills authorized by Miss. Code Ann. § 51-9-131 (1972) should be used only for the payment of bonds, the Court does not have before it sufficient information to order a return of any funds to the Plaintiffs.
The Chancellor never addressed the need for an accounting.
The District appealed. The counties cross-appealed on the Chancellor's refusal to require a return of the tax levies in *1341 excess of the bonded indebtedness, at least to the extent the District is able to make such return, arguing that at the end of fiscal year 1981 the District had in its Property Improvement Fund $1,357,312 belonging to the District. On cross-appeal the counties ask for an accounting and an award.
The majority has reversed and rendered.
The majority is perhaps correct, in the narrow, technical sense that tax revenues are not restricted solely to serving the bonded indebtedness. If we are going to so hold, however, we are certainly obligated to address the alternative relief, or reverse and remand the matter to the Chancery Court for such relief. It is unquestionably clear from the record  indeed, the majority opinion recognizes  that vast expenditures have been made for purposes not authorized by law.
By simply reversing and rendering we do not even address the question, or afford the Chancery Court an opportunity to do so.
The record in this case cries out for exposition from a court, of vast public expenditures beyond any semblance of statutory authority, and for appropriate relief to avoid their continued repetition, or even further aggrandizement by the District. The majority opinion does no more than cursorily allude to these expenditures with an editorial comment of distaste.
The counties were clearly entitled to an accounting; as to attorney's fees, this is one of those "if ever there was a case" cases.
From a record of 13 volumes and over 150 trial exhibits, I will, as briefly as I can, give the basis of my conviction that the counties are entitled to an injunction under the alternative prayer, to an accounting and, of course, to attorney's fees.

HISTORY AND BACKGROUND
The Pearl River Valley Water Supply District is really a misnomer. What would constitute a more accurate title will be reserved until further discussion.
In December, 1957, two engineering firms presented a feasibility study (for damming the Pearl River and creating a reservoir) to the Pearl River Industrial Commission, a state agency created by Chapter 169, Laws 1956, Miss. Code Ann. § 51-9-1 (not to be confused with Pearl River Water Supply District).
The study describes the project purposes:
(1) Creation of a water reservoir sufficient to insure for years to come adequate water for independent development of central Mississippi, and also domestic and light industrial water reserve for the City of Jackson.
(2) Assist in pollution reduction
(3) Provide gravity irrigation for land areas in several counties below the dam.
(4) Provide recreational water in central Mississippi to create economic opportunity based on recreational visits.
The study detailed all the possible uses outlined above and the boon this would be to the area. The impoundment structures could be designed, according to the study, to take care of extraordinary flooding.
Perhaps a total of three-fourths of a page of this 70-odd page analysis mentioned a possibility of 1,600 acres as available for leasing of permanent home sites, primarily on the west side of the reservoir in Madison County. It was roughly estimated that the income from home and cabin sites would yield a minimum of $10,000 per year.
In the summary of estimated economic benefits from construction of the project, this item of income from rental of residential sites was not mentioned. The total annual net economic benefits from the project was estimated to $482,630.[1a]
The study recognized the need for legislative authority for this project, and for any authority beyond inundation of the land.
In 1958 the Legislature authorized the Pearl River Valley Water Supply District, Chapter 197, Laws 1958, Miss. Code Ann. § 51-9-101, et seq.
*1342 Section 2 of this Act declares the policy for the creation of the District. (Miss. Code Ann. § 51-9-103) In summary it notes that the preservation, conservation, storage and control of surface waters are necessary to insure an adequate, sanitary water supply at all times to promote the balanced economic development of the state and to aid in flood control, conservation and development of state forests, irrigation of lands needing irrigation, and pollution reduction. It further determined that such preservation, conservation, storage and control of the Pearl River and its tributaries and its overflow waters for domestic, municipal, commercial, industrial and agricultural purposes, and for recreational uses, for flood control, timber development, irrigation and pollution reduction were, as a matter of public policy, for the general welfare of the state.
Section 5(d) of the Act, Miss. Code Ann. § 51-9-109, authorized the District, following approval by the Chancery Court of Hinds County, to acquire land necessary for the reservoir, and for an area not exceeding one mile from the shore line at high water mark for "related facilities." The related facilities, provided they were set forth in maps and exhibits to the petition, were defined as including "property, land, or areas of land," adjacent to the reservoir which could be acquired, owned, rented, leased, or sold by the District in connection with the recreational or industrial development and use of the project.
Five counties joined the District: Leake, Scott, Madison, Rankin and Hinds. By statute, the board of directors of the District is comprised of 14 members.
The board of supervisors of each of the five counties appoints a member, the Governor appoints another five members, one from each county (his appointee being one of three nominees submitted by its board of supervisors), and one each from the following state departments: Commission on Natural Resources, Commission on Wildlife Conservation, Forestry Commission, and State Board of Health. Miss. Code Ann. § 51-9-1 (Supp.); Miss. Code Ann. § 51-9-107 (Supp.)
On July 31, 1959, the engineering firms submitted a two-volume study to the newly-created Pearl River Valley Water Supply District. In this study, the firms detailed the dam construction, land clearing, dredging, and inundation, and again set forth at length the economic boon to the area from the purposes for which the reservoir was constructed.[2]
Any question about the legality of leasing the District land for permanent homes was gone from this study.
The engineers anticipated a lease of 4,000 residential lots after the fifth year of operation, at an annual rental of $125 per lot, totaling $500,000, and 20 commercial lots at $20 per lot. It was estimated that a $7.00 monthly water and sewer charge would pay for all water, sewers, and streets.
The engineers stated: "Our estimates indicate that the commercial revenue may reach an amount sufficient to eliminate the District tax in about five years after completion of the Project."
In May, 1961, the engineering firms prepared a shoreline development study for the District. This study envisioned the major portion of the reservoir south of Highway 43 being utilized as private subdivisions for whites, and also private subdivisions for blacks, several motels, a resort hotel, shopping centers, business firms' clubs, and the like. Several recommendations were made as to the manner of leasing this property, and charges to be made. The charges, however, all specifically excluded costs of providing sewer, water and municipal services. Annual ground rental for residential lots began at $100 and went over $250.
The utility services, street maintenance, garbage collections, and mosquito control were to be provided as a separate function apart from the current responsibility of the District. As to these, the study stated:

*1343 It is anticipated that these facilities will be directed through a separate but correlated agency of government or nonprofit corporation, and the financing will be accomplished through revenue bonds retired by periodic charges assessed to the users.

These utilities may, or may not, be provided in conjunction with the provision of access roads and streets, garbage collection, mosquito control, etc. [Emphasis added]
Law enforcement was to be provided by the sheriffs' departments.[3]
The District is comprised of 48,098 acres, of which 30,325 are under water at 298 feet above sea level. The dam was completed at the end of 1963 and the reservoir was filled to its normal capacity of 298 feet in the early months of 1965.
Pursuant to the authority of Section 22 of the Act, Miss. Code Ann. § 51-9-143, the District, on December 1, 1964, entered into a Trust Indenture agreement with the Deposit Guaranty Bank and Trust Company of Jackson, with the bank as Trustee, dealing with the issuance of $24,650,000 in refunded bonds, their repayment, and the method of financing the operation and maintenance of the District while the bonds were outstanding.[4]
The trust indenture sets forth in detail the allocation of revenues and funds. All monies derived by the District from rental or leasing of property, timber sales, and the City of Jackson contract,[5] and the monies derived from the general two mills ad valorem tax levy provided for in Section 16 of the Act, Miss. Code Ann. § 51-9-131, are required to be paid by the District into a fund designated the "Revenue Fund."
The Revenue Fund is controlled by the Trustee. The indenture requires that allocations and deposits to be spent by the District are to be made monthly from the Revenue Fund into separate funds created and specified in this instrument as follows:
(d) The trustee allocates and deposits in the "Operation and Maintenance Fund" sufficient sums to provide for the payment of reasonable expenses of operating and maintaining the "project"[6] in good repair and working order during the current fiscal year. This amount is to be determined by budget adopted by the board of directors, and be reasonable but adequate to provide the payment of such expenses under economical management.
(b) After deposit in the Operation and Maintenance fund of a sum sufficient to meet the requirements under the budget, the entire balance remaining in the Revenue Fund, and all the avails of a special tax levy of two mills, provided for under Section 20 of the Act, Miss. Code Ann. 51-9-139, are allocated and deposited in a "Bond and Interest Fund" until it has sufficient funds to pay the principal and interest on bonds maturing and accruing in the fiscal year, and sufficient for redemption of bonds required to be redeemed in the current fiscal year.
(c) After sufficient deposits are made for the purposes of the Operation and Maintenance, and the Bond and Interest *1344 Funds, the entire balance of the Revenue Fund and the avails of the special tax levy are required to be deposited in a "Bond Reserve Fund" until it accumulates $1,000,000. This fund is to be used solely for paying principal and interest on bonds, whenever and to the extent that the funds in the Bond and Interest Fund are insufficient for the purposes for which it is created, including the redemption of bonds required to be redeemed during the fiscal year. If there is any balance in this fund, it may be used to pay or redeem the last outstanding bonds of the bond issue.
(d) After deposits have been made as provided for in (a), (b) and (c) above, the entire balance of the Revenue Fund, or so much of it as may be necessary, is required to be deposited in a "Shoreline Development Fund" until it has sufficient funds accumulated to provide for the construction of capital improvements of public benefit on the shoreline of the project, and within the project area, scheduled for construction in the current fiscal year. It is further provided that the deposit to this fund shall not exceed $300,000 in any fiscal year. The amount to be deposited shall be determined by the District budget adopted by the Board. The indenture lists, but does not limit, the expenditures to capital improvements such as public health facilities, sanitation and pollution control facilities, access to the reservoir and its shoreline, boat ramps, docks, launching facilities, water distribution systems, utilities, safety facilities, and suitable buildings for these purposes. All improvements are required to be of public benefit, however. Finally, any balance remaining in this fund after such expenditures are required to pay or redeem the last outstanding bonds of the bond issue.
(e) After deposit has been made as required in paragraphs (a), (b), (c) and (d) above, the entire balance of the Revenue Fund, or so much as may be necessary, is required to be deposited in a "Project Replacement Fund" until it reaches $1,250,000. This fund must be used solely for paying cost of unforeseen contingencies arising in the operation and maintenance of the project, or paying the cost of renewing, repairing, or replacing such parts of the project as may need renewal, repair or replacement from time to time. Any balance remaining in the Project Replacement Fund shall be used to pay or redeem the last outstanding bonds. The indenture also requires that in any year in which the Project Replacement Fund has less than $1,250,000 on deposit, risk insurance shall be secured as required by the City of Jackson, to insure the dam.
(f) After deposit has been made as required in all the above paragraphs, the entire balance remaining in the Revenue Fund must be deposited in a "Bond Redemption and Surplus Fund", and used to redeem bonds called for redemption prior to maturity, as authorized under the indenture, or to purchase outstanding bonds as provided by law.
The fiscal year under the indenture is November 1 through October 31. The district is required to employ a consulting engineer, who each year must make an inspection of the project and recommendations regarding repairs, replacements, maintenance and operation, improvements needed, and other matters. Following the report of the engineer, the District is required to make a budget for the ensuing fiscal year. This budget must contain an estimate of receipts to be derived from operation of the project, including the annual $500,000 payment from the City of Jackson. Also to be included in the budget is an estimate of the receipts to be derived from the two tax levies, and any other source or sources.
In addition to all estimated receipts, the budget is required to list an estimate of the cost of operating the project for the ensuing fiscal year, of any unusual or extraordinary expenses which might be reasonably anticipated, including renewal, repair or replacement expenditures. Further, the budget is required to state the bonds which will become due during the fiscal year, the interest on bonds which will become due, *1345 and a statement of the principal amount of bonds which will be callable, and the amount on deposit in each of the Funds.
The trust indenture sets forth the utilization by the District of the two tax levies. Section 16 of the Act, Miss. Code Ann. § 51-9-131, provides that the tax collector of each county, beginning in 1961, shall pay to the District depository the amount of two mills of all ad valorem taxes due the State, as long as the bonds are outstanding.[7]
Section 20 of the Act, Miss. Code Ann. § 51-9-139, requires the counties to levy an additional ad valorem tax not to exceed two mills, to provide additional funds for the payment on the bonds, and "other charges" if found necessary by the District, by order entered on its minutes each year the tax is found necessary.
For the years 1961 through 1966, the regular and special levy was required to meet the bonded indebtedness. In subsequent years the tax levies far exceeded the amount needed to meet current bonded indebtedness. Beginning with the year 1977, the Section 16 two mill tax levy alone exceeded the annual interest and bonds maturing. There was no necessity thereafter for a special levy to meet any bonded indebtedness.
In 1967 the District began depositing funds in the Shoreline Development Fund, that year depositing $269.400.
In May, 1963, the Board retained a real estate appraising and developing firm to make a study of the private shoreline development of the reservoir for private ownership. The study culminated in a "master plan" of land development around the reservoir, that was adopted by the District.
Below Highway 43 approximately 60 per cent of the entire area was to be leased. Out of a total of 5,038 acres, 3,002 acres were designated for leasing to private and commercial establishments; 1,397 acres, or slightly less than 35 per cent, were to be reserved for parks and public use, and the remaining 638 acres were recognized nondevelopable, or wilderness.
Above Highway 43, the upper reaches of the lake, was to remain essentially rustic, with some cabin sites, camp grounds, and trailer parks.
Following the study the Board employed the realty firm to market the lots. For all lots leased, there was a 7 1/2 per cent commission, of which 5 per cent went to the broker who made the sale, and 2 1/2 went as on over-ride to the real estate developer. The record does not reveal the total sum from which this commission was taken, but financial reports show a total of $1,139,582 paid in such commissions from 1966 through 1981.
The first lots, 115, were sold in 1965, and in 1966 194 lots were sold. No strong demand developed for the lots until 1970.
Upon the advice of the realtor, the District's method of conveying the lots to the individual homeowner was by a long-term, 60-year, renewable lease. The realtor appraised the market value of the lot. Also, there was figured the cost of developing the entire subdivision: streets, sewer, water. Then, there was assigned to each lot its pro rata share of development cost of the entire subdivision. The purchaser, or "lessee," then paid the District as a "front end" payment the pro rata development cost. The "front end" payment made by the purchaser was actually greater than the true pro rata cost of each lot's development. The "front end" payment was raised to an amount so that when 60 per cent or 80 per cent of the lots in the subdivision were sold, the entire development cost of the subdivision would be recovered. There was thus no need to wait until a subdivision had been sold 100 per cent to recover all development costs. As to the remaining balance of the price of the lease of the lot, the homeowner, or lessee, would *1346 pay six per cent of this sum for each of the 60 years of the lease. This may be illustrated as follows: assume a value of the lot at $10,000 and a front end payment of $3,000. As to the remaining $7,000, the lessee would pay six per cent of this sum for 60 years, or $420 a year annual "rent".
The lease agreements also provide that the lessees can be charged an added or pro rata portion of the District's cost of police protection and street maintenance.
In March, 1966, the Board upon its minutes established a separate fund which it designated the "Property Improvement Fund", stated to be a "revolving fund for improvements made and paid for, or to be paid for," by the lessees.
At this meeting the Board also established and authorized the activation of the Shoreline Development Fund.
The District officers were directed to open bank accounts in the name of these funds, subject to check thereon as all other reservoir funds.
It is the District's use of the Property Improvement Fund and the Operation and Maintenance Fund which caused most of the problems resulting in this lawsuit.[8]
The details thus far given are necessary for a clearer and more comprehensive understanding of the facts which will be related and conclusions drawn therefrom.
One of the purposes of this reservoir or lake was recreation to the public. Boat ramps, marinas, shops selling fishing tackle, bait, and items for visitors and tourists, restaurants, all open to the public, can be seen as having a relationship to this purpose. Arguendo, we can extend this to lake shore motels, or even a resort hotel.
What recreational purpose for the general public is served, however, by the development of private lots for sale as permanent homes to individual homeowners? None whatsoever. Nor, was it a function of the District, as part of the recreational purpose, to do a favor to individuals wanting to have a lot on or close by a lake.
The only possible justification for such development was to produce income, to make money for the District, and thereby relieve the taxpayers.[9]
When a lot was sold, regardless of what name it was called, the District was in effect selling a lot for at least 60 years. A certain value was assigned to the lot. Part of it was paid in cash, as a front end payment. The remainder was paid by paying interest on the principal for 60 years. This payment was a return on capital, part of the payment for an improved lot, as it existed when sold or leased.
In its operations the District has made a serious financial misjudgement. Instead of treating these annual payments as a return on capital for which there was no reciprocal obligation due the lessee or homeowner, the District treated these annual payments as part or full payment of services it rendered to the homeowners.
For years, until 1976, the District made no charge to the lessees for garbage pickup. Even at the time of the trial in June, 1982, the District was paying all fire protection costs, all police protection costs, all street maintenance and repair costs, and all administrative costs for these subdivisions. Further, it was charging the lessees far less for water and sewer than it cost the District to furnish water and sewerage to the lessees.
Any subdivision developer who, as part of the fair market price for a lot as it existed when sold, agreed with the purchaser to thereafter furnish him fire and police protection, and maintain the streets at no charge, and furnish water and sewers at sums less than cost, would be a candidate for an insane asylum.
*1347 Yet, this is precisely what the District did, which will be more specifically set forth below.
Except for the mention of these charges in the preliminary studies made by the engineer in 1957 and 1959, this record is devoid of the District ever making a study to determine, or even discussing, what would be the cost to the District of furnishing municipal services to the lessees, until an engineering report brought it to the Board's attention in 1981.[10] Somehow, they assumed the annual lease payments would take care of them.

THE LEASES
Why would the District want to develop private subdivisions to sell or lease the lots to private homeowners? Would that help the multitude of visitors and tourists enjoy the lake? Hardly. Were these lots needed for District employees? Hardly.
Of course, owning one of these lots was no doubt a wish of many individuals. But, would such ownership promote recreational enjoyment for any of the people except the favored few who were able to buy a lot?[11] Did it promote flood control, irrigation, pollution reduction? We must conclude development of subdivisions for private ownership served no public purpose whatever. There was no over-riding public need, or necessity to relocate several thousand homes on the reservoir land.
As noted, the only possible justification for removal of three-fifths of all land below Highway 43 from use and benefit of the general public was to make money, to enable the District to meet its goal of becoming self-sustaining. The only purpose could have been to reap financial benefit, clear and unencumbered without any reciprocal obligations from such receipt.
The result has been precisely opposite. Instead of the subdivisions relieving the District and the taxpayers of financial burdens, they have added to them.
As observed, all lease rentals should have been completely aside from, separate and apart from any "municipal" charges. By municipal charges, I mean what it costs a landowner to live in a municipality in which he expects the city to maintain his streets, furnish water, sewer, and afford him fire and police protection. These services are paid for by the property owners who receive them.
The District should have first determined whether or not it proposed to render any, some or all of these services. Before rendering any of them, a determination should have been made as to the actual cost of the District of each, and arrangements made to see that each landowner was charged his proportionate share. It can be readily seen that it does not matter how much the District receives from lease rentals vis-a-vis the municipal charges. They have nothing to do with one another. Lease rentals have nothing to do with rendering municipal services to the lessees.
Had the District adhered to this most basic ingredient of business judgment, the lease rentals would have been of some net economic benefit to the District, would have relieved the taxpayers of the five counties, and very possibly might have enabled the payment of bonds before due date.
Indeed, the leases provide that the District can charge additionally for police protection and street maintenance, and from the beginning charges were made, albeit nominal, for water and sewerage.
Yet, this has not been the way the District operated. The cost to the District of performing and rendering municipal services has never been determined, nor has there been any attempt to determine them. Rather, all such costs to the District for rendering these services to the subdivisions  water, sewer, fire and police protection, and their administration  have been commingled *1348 with the cost of operating the entire District under the Operation and Maintenance Fund. And the District has naively assumed the lease rentals were supposed to help pay the municipal charges.
Much sadder to relate, even counting the lease rentals, the subdivisions still do not pay what it is costing the District to serve them. If you omit lease rentals as part of the payment for municipal services, the subdivision owners only pay a pittance of the cost.
Let us see.
As between the District and the Property Improvement Fund, the District has transferred all front end payments, all tapping fees, and all sewerage charges into the Property Improvement Fund.[12] The Property Improvement Fund has been restricted to defraying development, construction or property improvement costs for these private developments.
After leasing, all expenses for the care, operation, repair, maintenance and protection of the subdivision and commercially leased properties, and the administrative costs entailed thereby, have been paid by the District out of the general Operation and Maintenance Fund.
The entire income to the District from the lessees has been the annual lease rentals, and whatever charge the District placed on the lessees for water, sewer and garbage collection. As noted, no garbage collection charge was made until 1976 and at trial it was shown the water and sewer charges were far too low. There has never been any charge made by the District to the lessees for police protection, for fire protection, for street maintenance, or for any administrative cost in rendering these services.
The idea, or basic philosophy, of the general managers, the Board of Directors, and their advisors  and indeed the only justification for private disposition of these land areas  was to get the District "self-sustaining" as soon as possible, but especially by 1999, when the bonds are all retired.
It has not worked that way, not at all.

GARBAGE
While not a major item, this illustrates the thinking of the managers and the Board. No charge was made for garbage collection until February, 1976, ten years after the first lots were sold. At that time a charge of $2.00 per month for residential and $20 per month for commercial was instituted. The cost for garbage collection to the District was estimated by the Board to be $29,000 per year and it was also estimated that the monthly charges would bring in $20,000 a year. When asked why the lessees were not paying the full $29,000, the manager stated that some of the cost was attributable to the public areas.
No attempt was made to determine (a) the true cost to the District for garbage collection, or (b) the actual cost to the District for rendering garbage service to the lessees.[13]
More interesting, in 1980, the District contracted with a private firm to collect all garbage at $3.39 per residence.
The contract with the waste management firm did not cover all expenses the District had in connection with garbage collection, however, because the District, not the private firm, had to collect from the lessees. Therefore, there was an added administrative and incidental costs entailed in having to collect monthly from a thousand or so customers. Manifestly, some charge should have been added to the $3.39 to take care of this extra cost to the District. One member of the Board at its June 13, 1980, meeting made the motion to increase the monthly charge from $2.00 to $3.50, presumably *1349 to look after the District's interest, and taxpayers' interest.
This motion died for lack of a second.
The general manager suggested the District charge the lessees $3.00 per month (a loss of $.39 per month).
The Board finally decided to charge $3.30 per customer per month, nine cents per customer less than what the District was paying the waste management firm.

WATER AND SEWER
In 1981 the District was still charging the lessees the same water and sewer rates as it did in the beginning, 1965.
An engineering firm made its report to the District in November, 1981.[14] This report states that the available records of the District "tend to combine many water and sewerage operating costs in with general operating expenses." The study continues,
"Therefore, it was not possible for Hensley-Schmidt, Inc., to accurately determine all of the operating costs, yet from our experience with comparable water and sewer systems, we know there are many other real costs to the District."
The report then gave the major operating and maintenance costs, as estimated by the District staff, at $325,000 a year.
This estimated cost did not take into consideration reserves for depreciation, for capital improvements such as wells, tanks, transmission mains, lagoons, e.g., the wear and tear and eventual replacement of capital expenditures. It mentioned that recently an expense of $50,000 had to be made to improve a well to meet standards.
The District in 1981 was getting $142,473 a year for water, and $70,584 a year for sewerage, or a total of $213,057, as opposed to the $325,000 operating cost.
The study showed that other comparable water and sewer systems in the area charged from 61 per cent to 80 per cent more than the District was charging for water, and 191 percent to 263 per cent more than the District was charging for sewerage collection.
The study recommended drastic increases in the rates, and gave several alternatives. The alternatives ranged from an increase of $50,000 up to $100,000 per year additional on the water. The sewerage increase alternatives ranged from an additional $80,000 per year to over $200,000 per year increase.[15]
In January, 1982, the Board did increase the water and sewer rates to bring in an estimated $409,374 a year, the increase beginning November 1, 1982. Sewerage rates were increased to bring in 75% of the water rates.
The difference between the cost of furnishing water and sewerage from 1965 to 1982 to the lessees and what they paid  an average loss of at least $75,000 to $150,000 yearly  was made up, of course, in taxes from the five counties.
Even now, we do not know from the records just what it costs the District to furnish water and sewer to the subdivisions.
As to the solid waste, the engineering firm recommended a ten per cent service charge to take care of administrative costs. This was never implemented by the Board.

POLICE AND FIRE PROTECTION
We begin this survey by noting that neither Madison nor Rankin Counties seek to patrol the District, or furnish fire protection. The District undertakes the police and fire protection, and no doubt renders commendable service of them both.
The lessees pay nothing for police or fire protection. What does it cost the District  or the taxpayers of the five counties  to furnish this protection to the lessees? Surely, it is a safe assumption such protection for a four-to-five thousand population urban community does cost somebody.
*1350 No exact figure is available because the District has never seen fit to determine these costs, or endeavored to do so.
Some disturbing estimate may be gathered, however, by examining the accounting reports of the accounting firm beginning in 1967. The cost includes salaries, social security, uniforms, supplies and transportation, and special training.[16] Not included are automobiles, equipment, gas, oil, and repairs and maintenance of the equipment they use in fulfilling their duties.
In 1967 this cost to the District was $50,381. The reservoir was the same size then as it is today. In 1968 the cost was $57,552, a jump of $7,000. In 1969 the cost was $59,006 and in 1970, $60,487. In 1971 the cost was $68,765, a jump of $8,000, and in 1972 the cost was $76,460, a jump of another $8,000. In 1973 the cost was $77,460. In 1974 the cost was $99,472, a jump of $22,000. In 1975 the cost was $119,310, a jump of $20,000. In 1976 the cost was $148,295, a jump of $29,000.
The 1977 accounting reports are the first to state the salaries of the fire protection personnel. Beginning that year the police and fire costs are combined. Still excluded, however, are all equipment costs, gas, oil, and repair and maintenance of such equipment.
In 1977 the cost was $178,219, a jump of $30,000 over 1976. Of this cost $130,462 was salary for the security personnel and $24,597 was salary for fire personnel.
In 1978 the total cost of the two was $216,896, of which $168,606 was security personnel salaries, and $34,029 was fire personnel salaries. In 1979 the total cost of the two was $244,515 (a jump of $28,000), of which $193,821 was security personnel salaries, and $39,144 was fire personnel salaries.
In 1980 the total cost of the two was $273,635, of which $215,997 was security personnel salaries, and $48,220 was fire personnel salaries, a jump of $29,000 over the previous year.
In 1981 the total cost was $286,707, of which $220,140 was security personnel salaries, and $55,117 was fire personnel salaries, a jump of $13,000 over the previous year.
In 14 years we have an increase in this single category from $50,381 to $286,707, an increase of over 450 per cent.
The same sharp increase is evident in the equipment and shop expense, but I see no need to belabor the point.[17]
Over $200,000 in rolling equipment for a fire department equivalent to the needs of a small city was purchased by the District within three years prior to the trial. A well-equipped pickup would meet the fire protection needs of the few buildings of the District, such as the shop and office building.
Surely it would be irrational to contend these rental properties did not cost the District  the taxpayers of five counties  at least $50,000 in 1975 and yearly increased to a cost of at least $150,000 in 1981, just for the salaries, Social Security, and uniforms of security and firemen.
At trial the District stated no plan to institute a charge for these services.
Why?

STREET MAINTENANCE
Neither the fiscal officer nor the general manager knew what it cost to maintain the streets in their little city. As with other enumerated items above, this cost was paid under general operation and maintenance expenses. One of the officers was of the opinion the cost was minor. The streets in the subdivisions, however, do constitute 30 per cent of the public roads maintained by the District.
Of course, it does not matter what the cost actually was, the District officers and *1351 Board were under a duty to keep records so that the precise cost to the District of this maintenance and upkeep would be known at all times.
An example of the District's ability to look after the taxpayers is shown in another facet to this street maintenance.
It is elementary that when a street or road has been dedicated to public use, the municipality or county thereafter has the obligation to maintain it. The power to control and regulate the use of the street or road as a public way is in the municipality or county. One way to dedicate a street or road is by map duly approved by the local political subdivision, after the streets or roads thereon have been constructed to meet specifications. The map or plat is then recorded on the public records. See: City of Columbus v. Payne, 155 Miss. 170, 124 So. 269 (1929).
Rankin County adopted a comprehensive plan for subdivisions in District 2 of that county, making detailed engineering requirements before it would accept streets in subdivisions of that county. Article V, Section 500, Section 503.10 recognizes the duty of the county, upon a street meeting all requirements, to thereafter maintain it.
Yet, the District agreed with Rankin County that Rankin County would have no obligation whatever to maintain the streets in these subdivisions, even though completely constructed in accordance with the comprehensive plan.
The taxpayers of Leake, Scott, Madison, Rankin and Hinds counties will pay for the maintenance of the streets.

ADMINISTRATION
At last report before trial the District had an urban community of approximately 5,200 people. Again, no administrative cost whatever is assessed to the lessees. The District has attempted to completely absorb these costs, just as the police, fire and street repair and maintenance, in the "lease rentals." Who ever heard of a city running without such expenses? The city engineer, the sewerage and water maintenance crews, the street repair crews, and the office personnel to keep and maintain records? The District had no plan to institute charges for these costs.

ARE THESE PRIVATE VENTURES PAYING WHAT THEY COST THE DISTRICT?
In my view, it does not matter what the District receives in lease rentals, none of this money should be used to defray municipal charges or costs. Rather, lease rental income should be considered separate and apart from any obligation to render such services. It seems fundamental to me that municipal services should be paid for by the people who receive them and by no one else.
It also seems fundamental to me that these costs should not be paid with the District's own money, derived from the sale of irreplaceable land.
The District has had another view, as I have demonstrated in tedious detail.
Yet, it also appears that, including these lease rentals, the subdivisions still do not pay what it costs the taxpayers of the five counties to render these services.
Each year the District submits to the State Budget Commission a request for authority to spend money. The general manager and fiscal officer are the persons who are primarily responsible for preparation of these documents. This is what they stated in each of the requests submitted to the Budget Commission in the years 1978, 1979, 1980, 1981, and 1982:
There are approximately 4,000 citizens living on property developed by the District. The furnishing of utility service, street maintenance, and police and fire protection constitute a major portion of the Agency's budget. [Emphasis added][18]
*1352 The accounting firm's figures show that in 1966 the Operation and Maintenance Fund spent $472,876; in 1971 $580,000; in 1973, $645,000; in 1975, $987,125. In 1980 it was $2,185,000 and in 1981 it was $2,429,375, a jump of $240,000 over the previous year.
Can there be any doubt these private developments account for at least one-half of this figure? If we take the District's own word, they cost more than one-half.
How does this compare with the income? Let us examine the last two years for which figures were given at the trial.

 FISCAL YEAR ENDING
 OCTOBER 31, 1980
 Total Operation and Maintenance Expenditures $2,185,000
 Receipts from Subdivisions
 Sewer Charges 70,584
 Water Sales 142,572
 _______
 213,156
 Lease Rentals 599,827
 _______
 Total 812,983
 One-half of Operation and Maintenance
 Expenditures 1,092,500
 Less Total Income from Subdivisions 812,983
 _________
 Deficit $ 279,517
 =========
 FISCAL YEAR ENDING
 OCTOBER 31, 1981
 Total Operation and Maintenance Expenditures $2,429,375
 Receipts from Subdivisions
 Sewer Sales 76,941
 Water Sales 156,724
 _______
 233,665
 Lease Rentals 582,902
 _______
 Total 816,567
 One-half of Operation and Maintenance
 Expenditures 1,214,688
 Less Total Income from Subdivisions 816,567
 _________
 Deficit $ 398,121
 =========

Omitting the lease rentals in 1981, the subdivisions cost the District, and the taxpayers of the five counties, approximately one million dollars more than they paid in.[19]
It must be conceded that we do not really know what these subdivisions are costing the District and the taxpayers of five counties. Just as significant, the reason we do not know is that the District has not even made a minimal effort to keep records which would accurately allocate the cost. No study was ever made, indeed, no records were kept from which it could be determined the cost to the District of furnishing these municipal services to the lessees.

THE PROPERTY IMPROVEMENT FUND
The minutes for the establishment of the Property Improvement Fund simply state it as a revolving fund for "improvements made and paid for, or to be paid for" by the lessees.
It became that and more.
There have been only two general managers of the District since its inception. Both of them, and the District's president, testified that they recognized this fund was not a part of the project's operation, that no tax money was supposed to go into the fund, and that it would be improper to use tax monies for development of the subdivisions.
The Property Improvement Fund has been used by the District, however, for two purposes: (1) to place on the District  and thereby the taxpayers of the five counties  the burden of paying for vast expenditures which should have been paid out of the Property Improvement Fund, and (2) to siphon off income that should have gone to the District, and thereby relieved the five counties of the tax levies, or for bond redemption. The first has been accomplished by commingling expenditures so that it will be extremely difficult, if not impossible, to trace for whose benefit the costs were incurred, and when such expenditures resulted in benefit to the Property Improvement Fund, they were treated as a part of the *1353 regular project of the District, paid for out of the Operation and Maintenance Fund.
Here, another factor also comes into play. Under the statute creating the District, the tax levies cease when all bonds are paid off. The City of Jackson also pays $500,000 a year under its contract with the District, which obligation continues only so long as any bonds are outstanding. Unless sooner paid, the last bonds to be retired are June 1, 1999.
Ordinarily, it is in the interest of any political entity to pay off its bonded debts, terminate the interest and save the taxpayers money. As may be observed from the "flow down" of funds in the Trust Indenture, this document is designed for this very purpose so that all surplus funds will "flow down" to redeem bonds ahead of maturity date.
In this case, by statute, we have a built-in conflict of interest. It may be in the interest of the taxpayers of the City of Jackson, the taxpayers of the five counties, and of the state, for the bonds to be paid off as quickly as possible.
The interest of the operators of the District is precisely opposite. It is in the interest of those needing funds to operate the District to postpone payment of the bonds as long as possible. When the bonds are completely paid, the tax spigots are turned off, the yearly $500,000 stipend from Jackson ends. The Property Improvement Fund serves this unfortunate interest well indeed.
By diverting public money into this fund, and not paying its share of expenses, the Property Improvement Fund has not only used "tax money" which the managers said it was not supposed to, but also served the unfortunate interest of delaying payment of bonds. The last fund of the Trust Indenture, the "Bond Redemption and Surplus Fund," has not only never been activated, no officer of the District expressed any expectation, interest, hope, wish or desire that it would ever be activated.
From this voluminous record, I will give some examples of the questionable use of public funds, as well as the unquestionable misuse of public funds through the Property Improvement Fund. These are by no means all, or necessarily the worst, but simply a sampling to show the necessity for an injunction as well as an accounting.[20]
The general managers testified the purpose of the Property Improvement Fund was to take the money paid by the purchaser for the cost of development of the subdivision and put that into the Property Improvement Fund, in order that there would be enough to pay for the development of the next subdivision. This presumably was the "front end" money paid by the lessee.
There is no record of the Property Improvement Fund ever repaying the District any of the money spent by the District on the Development of the first, or initial subdivisions. The 1966 accountant's report of the accounting firm Peat, Marwick, Mitchell & Company shows the Property Improvement Fund received $232,742 in front and payments by lessees. In 1967 the report shows a receipt of $160,291. Manifestly, some or all of this represented cost to the District for development of these first subdivisions. At least $300,000 in District funds are thus unaccounted for.
Over the years the District has charged the lessees a "tapping fee" of connecting the District water and sewer to the residences. The Property Improvement Fund has no employees, all District employees are employed by and paid by the District out of the Operation and Maintenance Fund. The District was paid a total of $35,095 in tapping fees from 1966 through 1981 for these services rendered by District employees. All of these receipts went into the Property Improvement Fund.
Many of the lessees entering into lease contracts with the District were unable to pay the entire "front end" payment, but financed it over a two- or three-year period, paying the District interest on the unpaid *1354 balance. Over the years it amounted to a total of $250,510, and all of it went into the Property Improvement Fund.[21]
Most glaring are the sewerage charges. These sewerage charges are direct costs to the District for monthly sewerage services to the lessees. These charges were far below the cost to the District, but at least should have been put into the Revenue Fund, as were the water charges paid by the lessees. Instead, they were put into the Property Improvement Fund, and total $493,396 from 1966 through 1981.
There was one undeveloped area leased undeveloped to a private real estate developer, who subsequently made the capital improvements for a subdivision at his own expense. He paid the District $250,000 for this undeveloped land, belonging to the District. The District put this into the Property Improvement Fund.
The plan of development, as explained by the real estate expert, was that when 60 per cent to 80 per cent of the lots in any subdivision were leased, the front end payments made on these leases would fully pay the entire cost of that subdivision, not only including the improvements within the confines of the subdivision, but also that subdivision's pro rate share of the lagoon, water tanks, and pumping stations needed to service all subdivisions. Yet, the District has put 100 per cent of all front end money into the Property Improvement Fund. Thus 20 per cent to 40 per cent over the cost of developing the subdivisions has gone or will go into the Property Improvement Fund. How many thousands or hundreds of thousands of dollars in excess funds have gone into, or will go into the Property Improvement Fund without some court order prohibiting it?
From time to time the Property Improvement Fund has borrowed from other funds. As will be shown, the Property Improvement Fund has consistently had a substantial sum of money on hand. In fact, the Property Improvement Fund has "earned" $725,245 in interest in the years 1974 through 1981 from the surplus it had on hand. Perhaps to meet construction expense or pay contractors without taking money from its interest bearing deposits, it has borrowed from the District funds. The Property Improvement Fund never paid any interest on this money borrowed. Thus, in the year 1979 we have the Property Improvement Fund receiving $122,874 in interest on Property Improvement Fund surplus funds. At the end of the year it owed other funds $124,000. In 1981 the Property Improvement Fund received $181,169 in interest, but at the end of the year, it owed $110,000 to other funds of the District. Thus, not only has the Property Improvement Fund in the years 1975 through 1981 received $725,245 in interest which should have gone into the Revenue Fund for the benefit of the taxpayers, but we have the Property Improvement Fund getting the benefit of interest-free loans from public, tax-supported funds, which funds were thereby deprived of interest they would have otherwise earned. Of course, if the Property Improvement Fund was a Trust Indenture fund, such interfund borrowing would make no difference.
Finally, there is no allocation whatever of the hours spent by District employees, District heavy and light equipment, District gas and oil, District administrative expense, in the development of the subdivisions. We do not know how many thousands or hundreds of thousands of dollars have been spent by the District in developing the land for these private residential and private commercial areas. We get indignant when county equipment works on some private subdivision. How many tax dollars have gone into these subdivisions in the same manner with no accounting to the taxpayers?
The Property Improvement Fund was never charged survey costs or the like. All such costs were paid by the District. We do not know how much, or what should have been paid out of the Property Improvement *1355 Fund as payment for specific costs to the District. There is no accounting of legal services rendered Property Improvement Fund activities.
This is the fund the general managers testified was not to have the benefit of "tax money."
Through the fiscal year 1981, the records reveal the Property Improvement Fund has received a total of $11,792,715. This sum has been derived from front end payments, tapping fees, interest, and some minor items. It does not include hidden payments or benefits through time, labor, material, administrative costs all supplied by District employees and District equipment. During this same period the Property Improvement Fund has expended on capital improvements for private benefit, $10,208,138, leaving a balance of $1,584,577. The 1981 accounting report shows the Property Improvement Fund had on hand $1,347,312.
At trial the District expressed no intention of doing anything differently in reference to the Property Improvement Fund than it has over the years.
Until 1974 the Property Improvement Fund had paid nothing into the Operation and Maintenance Fund for any costs which were attributable to Property Improvement Fund. From 1974 through 1981 the Property Improvement Fund has paid the Operation and Maintenance Fund a total of $1,664,394, but there is no accounting whatever as to whether this represents the true and accurate amounts due.
Certain definite sums of money can thus be seen in the Property Improvement Fund which should be repaid into a public fund of the District. Just as clearly, from all this commingling in which the District has engaged, the counties are entitled to an accounting to determine where all public monies have gone, and how much the Property Improvement Fund "owes" the District.
The Trust Indenture contains no authority for the Property Improvement Fund. The officers of the District testified the Property Improvement Fund was not supposed to receive tax funds, received no tax funds, and the purposes of its expenditures were outside the project.
Without creating this Property Improvement Fund, the District could not have financed from its own resources any private developments. Had the District stayed within the terms of the Trust Indenture, all payment for the private developments, and all such capital investment, would of necessity have had to come from outside sources, such as the engineer suggested in his 1959 study.
All District money, all District equipment, and all District personnel man-hours that were expended for the benefit of the Property Improvement Fund were, of course, diverted from the project, and from the funds in which they would otherwise have found final repository under the Trust Indenture.
Put another way, the entire Property Improvement Fund is a debt due the District from use of District funds, personnel and equipment.

WHAT IT COMES TO
Examining the four reasons for the District's existence: first, its benefit as a flood control enterprise has been dubious indeed; nor has it rendered benefits in either pollution abatement or irrigation. Jackson has had no need for the reservoir of water for the city's or industrial needs.
Of the four purposes, recreation has been the only one realistically served. The lake has no doubt furnished pleasurable hours to many. Even here, however, it is clear that overwhelmingly an effort has been made by the District officers to create, foster and nurture by state subsidy an urban resort community near the lake.
The effect of removal of priceless land from enjoyment by the public has been ignored. As to the possibility of a conflict which an urban community beside the lake will create in competing with the other purposes of the District  such as flood control, pollution control, and recreation by the public at large  there is no indication this *1356 has crossed the minds of the District officers.
The Pearl River Valley Water Supply District could now more accurately be called the Pearl River Urban Resort Community.
Since the District's formation, the taxpayers of these five counties have paid $12,139,569 over and above the bonded indebtedness payments of principal and interest. The City of Jackson has paid another $11,000,000 making a total of $23,139,569 paid in excess of the bonded indebtedness.
The District has not been short in its capital improvements, the construction of public facilities has not been neglected. The Shoreline Development Fund has spent a total of $4,464,411 since 1967.[23]
In the same period the Property Improvement Fund has expended $10,208,138 for private development. This excludes the benefits the District has rendered the Property Improvement Fund by District personnel and District equipment working on these private subdivisions, already noted.

COMMINGLING AND CONFLICT OF INTEREST
Two concepts involved in this case are more easily apprehended by judges and lawyers than by laymen: commingling[24] and conflict of interest.[25] I have given illustrations of commingling as well as obvious misuse of public funds regarding the Property Improvement Fund and the subdivisions.
These unlawful expenditures have no doubt come about because of the built-in conflict of interest in the system under which the District officers have operated. Under the statute creating the District, once the bonds are paid off, the District is entitled to no more tax revenues, and Jackson's $500,000 yearly obligation ceases. On the other hand, so long as a single bond remains outstanding, the District gets the two mill tax levy from all five counties, and can call on the counties, by the simple expedient of an order on the District's minutes, to levy up to an additional two mills in tax. In the year 1981, the last year for which records were introduced at trial, the District received $1,626,260 from the counties and Jackson over and above all amounts paid on bonds. The District has not been timid in its calls upon the counties for the additional levy. In 1981 they paid in ad valorem taxes over a million dollars over and above the amount necessary to retire bonds.
Had the District officers operated the District more frugally, these tax levies would either be reduced drastically or have gone to retiring bonds prior to their maturity. Also, if the District in the sale of leases had done two things: (1) seen that all income therefrom was net to the District, and (2) provided that the property owners, not the five county taxpayers, paid for all municipal services, this would have generated income which would have gone to retire the bonds. Such action by the officers of the District most assuredly *1357 would have been of benefit to the taxpayers of the five counties, saving them millions of dollars.
Such action, however, would result in paying off the bonds before 1999, and thereby terminate all ad valorem tax income from the five counties and from the City of Jackson.
The District officers have clearly taken the course of action which avoids any prepayment of bonds, or reduces the yearly ad valorem tax levy load on the five counties.[26]
Let us return momentarily to the Trust Indenture. The Trust Indenture was designed so that tax funds and other revenues would, wherever possible, be used to retire bonds. The first expenditure fund is Operation and Maintenance. The District's Board is required to spend money under it simply to operate and maintain the project, which of course excludes private properties, in good repair and working order during the year by "economical management." If the District has more than enough receipts for this fund's purpose, the overflow goes into the Bond and Interest Fund, and then to the Bond Reserve Fund.
Instead of restricting the Operation and Maintenance Fund solely to maintenance and repair of the public facilities and the administrative expense connected therewith, the District's officers have expanded it into servicing the entire privately-leased properties as well. Simply put, the Operation and Maintenance bucket has some very large leaks.
The Property Improvement Fund serves the same invidious purpose. This fund is totally aside from, and never envisioned by the Trust Indenture. The Property Improvement Fund has enabled the District to privately set aside millions of dollars which might otherwise be available to reduce the tax levies or retire bonds.
The festering of this conflict of interest has been revealed in the lamentable lack of effort to reduce yearly expenditures, thereby reducing the tax load on these five counties, as well as blatant foot dragging by District officers towards taking one single significant or substantial step which might reduce the tax levies, or retire bonds prior to maturity.
Perhaps this accounts for the reply of the president of the District's Board when asked during trial why no charge had ever been made for street maintenance: "... did not feel we needed to." Further, the president testified that the Board did not consider it necessary to charge the lessees for police or fire protection.
Let us take the curious reasoning of the general manager towards the conclusion of trial when the management of the District had been exposed. He was then asked whether the District proposed to start charging the lessees for these municipal services. He replied the Board had "begun" to pass through some of the costs. But, "detailed study" would be required before the Board could fairly and equitably distribute the costs. It would require another study by some "experts."
For seventeen years the District has been operating under this grossly unfair, disastrous business management, and still the general manager had not experienced a moment of truth. How else can his reasoning be explained than he was affected with a conflict of interest mental aberration?
How else can you explain the testimony of the fiscal officer of the District, holding a degree in accounting from a major state university? He said it was not his job to, and he never made any recommendation to the Board regarding these expenditures. This officer, together with the general manager, prepares the yearly budget request for the District to the State Budget Commission.
How else can you explain the dogged insistence of the District's officers, the consulting engineer, and the realtors that the District's affairs had been managed properly in all respects?
*1358 The reader will now be able to grasp the full import of the use of the Property Improvement Fund and the Operation and Maintenance Fund in reference to these lease rentals and private developments.
The Property Improvement Fund received District funds and District resources to develop property belonging to the District, and has been favored as the District officers saw fit to favor it over the years, unchecked by any obligation under the Trust Indenture.
All municipal services rendered these subdivisions, however  the fire and police protection, the water, sewer, and garbage, and the administrative expenses for all these  have been paid as regular operating expenses of the entire District from the Operation and Maintenance Fund. They have, and will continue to be furnished at no cost, or far less than cost, to the lessees under the District's mode and plan of operation.
The lessees have been favored. The Property Improvement Fund has been favored. Result: a few million dollars in irrevocably lost revenues from the lessees, and the Property Improvement Fund had $1,357,312 in net funds at last report on October 31, 1981.
If one were looking at the District's operation with a view of how well the taxpayers of the five counties had been served, such management would have to be deemed incredibly stupid.
On the other hand, if one viewed the operation as an attempt to keep the tax spigots turned on to a maximum flow and to delay payment of bonds to the last possible moment, the system is diabolically clever. No more perfect way of keeping these counties paying in over a million dollars a year in taxes in excess of the amount necessary to pay off bonds from now to June 1, 1999, can be envisioned.
Thus, the wisdom of an operation where there is a conflict of interest.

INJUNCTION
As noted in the beginning of this dissent, since the chancellor at trial found the tax levies by statute could only be spent for retirement of bonds, his injunction was limited to restraining the District from spending funds received by tax levy on anything other than payment on the bonded indebtedness. The majority having found the chancellor in error in this holding, we have an accompanying obligation to remand this case for determination by the chancellor as to what relief should be granted under the alternative prayer for relief, namely: enjoin the District from expending funds for any purpose not authorized by law. Coleman v. Keirbow, 219 Miss. 116, 68 So.2d 102 (1953); Howell v. General Contract Corp., 229 Miss. 687, 91 So.2d 831, suggestion of error overruled, modified 229 Miss. 687, 93 So.2d 175 (1957).
The chancellor's opinion indicates an awareness on his part of unauthorized expenditures by the District, although he never reached the question of injunction against any specific expenditures. The majority opinion recognizes there have been unauthorized expenditures. The brief of the counties set forth many allegations of unauthorized expenditures and use of properties[27] and gave as their reasons for so doing that in the event this Court should reverse the chancellor on the injunction he had issued, he should be afforded the opportunity to address the alternative prayer.
The details of this evidence will be of particular importance of this Court reverses the Chancellor's ruling and must remand for findings and rulings on those remaining counts.
Since the chancellor never considered specifically what acts should be enjoined, it would not be appropriate, in my view, for us to attempt to do so at this time. Rather, remand for consideration by the chancellor appears to be the proper procedure.
It is appropriate, however, for us to set forth some general guidelines to the chancellor, *1359 not to be considered, however, as all inclusive.
The counties are entitled to an injunction prohibiting the District from spending any tax money or District funds on private ventures, such as subdivision development, or subdivision maintenance, or direct or indirect subsidies of any kind to any lessees, commercial or residential.
I do not overlook that in excess of 5,000 people have permanent homes on District property. In the broad exercise of chancery powers, the chancellor could set out guidelines for their obtaining water, sewer, and garbage services, as well as fire and police protection. If the lessees and the District desire that the District continue to render any of these services, however, the plaintiffs are entitled to require the District set up, keep, and maintain separate records that will truly and accurately reflect the precise cost of each service rendered the lessees, and that the District is paid in full by the lessees for every service rendered them. The plaintiff counties are entitled, as a minimum, to an injunction from the court that will insure that from the date the District is permitted to expend tax funds for other purposes than repayment of bonds, that no county levy funds, or any other District funds, will be used for subsidizing any municipal service.
The counties are entitled to an injunction prohibiting the District from using public funds, public property, equipment, or District personnel in the development or maintenance of subdivisions or rental lands.
Put simply, the plaintiff counties are entitled to an injunction, framed and worded in such a way as will accomplish such end, that will insure that the taxpayers of the five counties are not taxed one dollar to pay for private ventures or private services. And, if a balancing of the equities requires that some of the municipal services to the lessees, such as water, sewer, and garbage be continued, then no record keeping should be countenanced which does not fully allocate and accurately reflect the actual cost to the district for each of these services to the lessees, and that the district is fully paid therefor.
Within the framework set out, the chancellor should give scrutiny to all planned or developed apartment houses and condominiums. The financial operation of these places of abode was not set out at trial.
The District plans a $700,000 golf course and it should be left to the determination of the chancellor whether this would be a significant recreational facility to the visiting public from areas surrounding the reservoir, or primarily for subdivision residents.[28] Unless of significant public benefit area wide, it should be forbidden.
The specific question of the legal authority for the Property Improvement Fund was never considered by the chancellor. I have serious questions about the District having any legal authority for the Property Improvement Fund as it has been used, but the chancellor should be given the opportunity to consider it, and hear further from the parties, if he desires. I would also add, that if the Property Improvement Fund as envisioned and used by the District is discontinued, and the District is required to adhere to the terms of the Trust Indenture alone, it appears many of the dangers of the diversion of public money to private purposes will be eliminated.
The District should be required to scrupulously adhere to the terms of the Trust Indenture as to the flow of District revenue funds.
Since the majority has held the District should not be restricted to spending tax levies on bonded indebtedness, the general tax levy should be restricted and limited to expenditures that may be necessary by economical management to keep the public facilities in reasonable repair, and no other. Tax dollars in staggering sums have been spent for purposes over and beyond this *1360 specific authorization of the Trust Indenture.
Surely, the Legislature in authorizing the District's creation, and the five counties when they voted to become a part of it, contemplated the tax levies would be for payment of bonds, and only modest tax levies would be required, if any, to operate and maintain the District. After all, the District does get $500,000 annually from the City of Jackson. It has a source of revenue in the use of its public facilities and should be receiving the lease rental free and clear of any reciprocal obligations to service the subdivisions or lessees.
The District has spent $4,464,411 out of the Shoreline Development Fund for construction and development of public facilities. The facilities have been paid almost entirely from special tax levy on the five counties. The chancellor should determine whether any tax levy money from the five counties should be spent for further developments of this kind. It would appear that the cost of such improvements should be borne and paid by some other source or sources than the tax levy of five counties.
Fundamental and well-established principles of equity applied in the courts of this state, as well as all other jurisdictions, recognize the plaintiff's right to injunctive relief of the nature I have outlined. See: McKee v. Hogan, 145 Miss. 747, 110 So. 775 (1927); 43 C.J.S. Injunctions, § 18, p. 784, 43A C.J.S. Injunctions, § 114, p. 187, § 116, pp. 195-196; Pomeroy's Equity Jurisprudence, 5th Ed., Vol. 4, § 1338, p. 935.

ACCOUNTING
While this was not a suit for monetary judgment against any District officers or the District, the plaintiffs in their prayer for relief first asked for an accounting for all revenues from tax levies which were not used to pay the bonded indebtedness, and to order the District to return to the plaintiff counties all tax revenues which had been spent on purposes not authorized by law.
The chancellor never addressed the need for an accounting in his opinion. He simply ruled that the court did not have before it sufficient information to order a return of any funds to the plaintiffs.
It thus appears that the chancellor considered that the records and financial statements furnished were an "accounting," and from these he had insufficient information to order a return of funds.
The plaintiffs have cross-appealed this adverse ruling, contending the evidence supported a return to them of funds and the unauthorized Property Improvement Fund had sufficient funds to make such return. The plaintiff cross-appellants then ask that this case be reversed and remanded for an accounting and an award.
I agree with the chancellor that he had insufficient information to make any determination of any specific sum to be returned to anybody. The chancellor was in error, however, in my view, in that he either misconstrued that the records he had been furnished were an accounting, or in simply failing to consider the need for an accounting.
This is manifestly a case where an accounting should be required of the defendants, following which the chancellor can determine what, how much, and to whom any sum should be paid. Since the counties only ask a return of funds to them, but no monetary judgment, there must first be ascertained from an accounting the money which has been spent in a manner or for purposes not authorized by law, and second what relief can be afforded the plaintiffs. We need not address whether any sum could legally be paid to the plaintiffs from the Property Improvement Fund, or whether it should. The Property Improvement Fund was generated from the sale of District property, and use of District personnel and equipment, and this fund belongs to the District and all five counties the same as the other funds.
Clearly, however, an accounting was the proper relief following the hearing in this case. Although voluminous  there are over 40 yearly audits of the State Department of Audit and the private accounting firm  nevertheless, because of the commingling of public and private expenditures *1361 out of the Operation and Maintenance Fund and through the Property Improvement Fund, the records furnished by no means constitute an accounting of public money spent for unauthorized purposes. An accounting is necessary to determine precisely the money spent for unauthorized purposes.
In any suit for an accounting, it is a matter for the court to determine from the evidence first, whether the plaintiff is entitled to an accounting. If the court finds the plaintiff is entitled to an accounting, he enters a decree ordering the accounting. Such decree is interlocutory in nature. The court may conduct the accounting himself, or refer the matter to a master. In complicated records cases, it is generally advisable for the chancellor to refer the accounting to a master under such terms and conditions as will require the defendant trustee to render a full and complete accounting of his conduct. This appears to be a case justifying use by the chancellor of a master. See: Griffith, Mississippi Chancery Practice §§ 24, 598 (2d Ed.); State ex rel. King v. Harvey, 214 So.2d 817 (1968); Miller v. Henry, 139 Miss. 651, 103 So. 203 (1925); 1 Am.Jur.2d Accounts and Accounting §§ 62, 63; Christian v. Green, 45 So. 425 (Miss. 1980); 1 C.J.S. Accounting §§ 40, 41; Walters-Southland Institute v. Walker, 217 Ark. 602, 232 S.W.2d 448 (1950).
The plaintiffs and their taxpayers are clearly entitled to require of the District through its officers a complete accounting to disclose and trace the expenditures of all tax funds in order that a determination may be made of how and how much public money has been directed to purposes not authorized by law.
An accounting is necessary in this case precisely because the District's officers have kept and maintained records which do not disclose the application of public funds to private purposes or the amount of money which was spent for private purposes, nor records which disclose the use of District personnel and District equipment for private purposes. As trustees with a public trust, they were clearly under a duty to keep and maintain such records.
The proper final relief which should be granted the plaintiffs must await the outcome of a complete accounting.
This accounting would also accomplish an incidental, but indeed salutory public purpose. It would, for the first time  and only time  enable the taxpayers of the five counties to know precisely how their tax dollars have been spent. Most assuredly, they are entitled to this information, which unfortunately has never been made certain or clear in any audit, or any budget requests. Without this accounting, the public will remain forever in the dark.

ATTORNEYS FEES
The chancellor awarded the plaintiffs as reasonable attorneys fee $70,204. The defendants do not challenge the reasonableness of this fee, but that any fee at all was allowed.
While attorneys fees are not generally allowable from an adversary, this was not such a case. This suit sought to preserve assets of the District, and as a result of the action, and the lower court's ruling, it was successful in doing so. Funds and assets were preserved for the benefit of all five counties.
Of course, if the majority is correct, and there is going to be a final judgment in favor of the defendants, then no attorneys fees are due the plaintiffs.
Under my view of the case, however, the chancellor was manifestly correct in awarding reasonable attorneys fees. The plaintiff counties have rendered an incalculable service to all five counties. As a result of their suit, they will be stopping bad management, the waste and dispersion of public funds. Well over a million dollars in the Property Improvement Fund is preserved for the District, rather than being dissipated on some private ventures.
To saddle the two plaintiff counties with all the fees after rendering services which would be of immeasurable benefit to all counties is repugnant. This repugnance is intensified when I consider that the District officers and Board of Directors will no doubt call on all counties, including the two plaintiff counties, to pay the cost of the *1362 District's attorneys and their experts in defending this case. There is a disheartening inconsistency in the law if we permit the District to say to the plaintiff counties: "you must help pay defense legal fees and costs," and at the same time saddle these two counties with all plaintiff attorneys fees.
Miss. Code Ann. § 11-53-37 is statutory authority for the chancellor's award of attorneys fees in this case. See, also: Alyeska Pipeline Service Company v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); Rocca v. Wilke, 53 Ohio App.2d 8, 371 N.E.2d 223 (1970); Universal Company v. Gore, 51 So.2d 429 (Fla. 1950); Hall v. Cole, 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973); and Reiser v. Del Monte Properties Company, 605 F.2d 1135 (9th Cir.1979).
The suit was clearly for the benefit, and to the benefit of the District and all five counties, and under my view, preserves funds and assets.
No state audit, Legislative, attorney general or district attorney investigation uncovered the staggering misuse of public funds, nor has any agency of the state taken any action which would preserve the assets of the District for the benefit of the five counties, and the public.
Instead, it has been brought to light by exemplary service of legal counsel of these two plaintiff counties.

CONCLUSION
No citizen of this country is required to enjoy being taxed; indeed, he is supposed to resent it. Most of us, however, are willing to pay any tax which is (1) necessary, and (2) has its burden fairly distributed. On this test the (beyond bond payment) tax levies on the five counties score pretty close to zero.
I would reverse and remand on the cross-appeal requesting an accounting and award, and following the accounting the chancellor would be in a position to address the appropriate relief.
On the direct appeal, if there is to be a reversal, in my view the plaintiffs are entitled to an injunction as outlined. Any tax funds spent beyond payment of the bonded indebtedness should be very limited and carefully circumscribed.
This is one of the rare cases in which our decision will directly affect, not just two, or a few litigants, but a significant percentage of the entire population of our state.
The plaintiff counties through their boards of supervisors have asked a court of this state to address serious problems  affecting several hundred thousand people  in this case, not in some other case. It is my view they are entitled to have a court tackle the problems squarely and directly.
I do not believe we should permit a shell game to continue in reference to District funds, with the vast sea of taxpayers in the five counties wondering from now to eternity just where all the money went.
The Ross Barnett Reservoir is unquestionably one of the most beautiful sights along the entire length of the enthrallingly beautiful Natchez Trace Parkway.
It deserves preserving as the Legislature intended.[29]
*1363 BOWLING, Justice, dissenting:
At the outset I wish to join with and commend Justice Hawkins from Chickasaw County [a county not remotely related to the reservoir] for the service he has done to certain counties involved in financing the reservoir, particularly the county of Hinds. He spent numerous weeks working diligently over the record that was sent to this Court and although the majority gives some relief in reversing the cross appeal, Judge Hawkins' original dissenting opinion clearly shows that this relief is not sufficient.
My biggest impression in this whole controversy begins with a reading of the provisions of Mississippi Code Annotated, Section 51-9-103 (1972):
It is further determined and declared that the preservation, conservation, storage and control of the waters of the Pearl River and its tributaries and its overflow waters for domestic, municipal, commercial, industrial, agricultural, and manufacturing purposes, for recreational uses, for flood control, timber development, irrigation, and pollution abatement are, as a matter of public policy, for the general welfare of the entire people of the state.
The above quoted section sets out the reasons for building the reservoir, and according to the statute's title constitutes the "legislative determination and declaration of policy."
My first reaction is that the word "municipality" refers to the "preservation, conservation and storage ... of waters" so that the water may be used by a municipality in the future. Admittedly, this "municipality" refers mainly to the City of Jackson, which has been paying the sum of $500,000 annually since the inception of the reservoir and will continue to do so until the year 1999 or the reservoir bonds are completely retired. This will be a total of $20,000,000, having not received and probably never will receive a drop of water from the reservoir. In deference to the present city administration, it should be made clear here that this contract was entered into for the entire term at the time the reservoir was set up.
The next provision of the quoted section that impresses me is that one of the purposes of the reservoir is "for flood control." I have found nothing in the case before us including the opinions which in any manner indicates that flooding of the City of Jackson has been controlled by the reservoir. On the other hand, the extent of flooding has increased by leaps and bounds since the reservoir was constructed. The victims also are the City of Jackson and Hinds County taxpayers, who contribute to paying for the reservoir.
Nowhere in the statutes have I found that the reservoir has been authorized to set up a "city" or "municipality" where a substantial part of the expenses are paid by the citizens of another city or county who derive no benefit other than possible recreational use.
The majority opinion interprets the statutes to authorize the payment of bonds by the taxpayers involved and that the bond money could be used "for the purpose of paying the cost of acquiring, owning, constructing, operating, repairing and maintaining the project." The majority opinion also points out that the "operating and maintaining" expenditures have increased from $622,455.03 for the year 1972 to the estimated cost of $2,687,500 for 1982. We can only speculate as to what this expense was in 1983. The majority opinion further points out that operation and maintenance expenditures have exceeded receipts from revenues and commercial lease payments each year and that this excess has increased from $417,464.16 in 1972 to a projected deficit of $2,558,000 in 1983. I will not lengthen this opinion but refer to the dissenting opinion of Justice Hawkins as to how these unbelievable situations have come about.
Admittedly, the Pearl River Valley Water Supply District has established a "city" on or near the banks of the reservoir. *1364 The leasing of the land does not pay the new city's expenses. At the risk of alienating friends to the east, it is readily seen why Rankin County did not join in the present suit. As hereinbefore stated and as clearly shown by the record and the opinions already written in this case, the reservoir property situated in Rankin County is already practically covered with real property placed on the reservoir leased property. Rankin County levies taxes on all of these structures at the same rate it taxes other structures in the county. We certainly cannot blame Rankin County for not wanting to give up this revenue and wanting to increase that revenue. Unlike Hinds County, we therefore see that Rankin County and others to a certain extent receive funds in varying amounts from the taxpayers' investment. I have heard that other counties in the state feel that Hinds County, containing the capital city, tries to exert its authority. Unfortunately, Hinds County, in the controversy before us, appears to be the "fall guy" in the whole mess.
A part of the lower side of the dam joins Hinds County, but it is hard to visualize any taxable income that Hinds County may ever receive therefrom. We, therefore, go back to our hereinbefore set out statement that all the money "given" the reservoir district each year by Hinds County, which figure is now becoming astronomical, is in the form of a subsidy for a new city in Rankin County on the banks of the reservoir, whose citizens pay no city taxes as that term is commonly understood. The taxpayers paying this subsidy have the great privilege of fishing or boating in the reservoir, if they wish, or attending a nightclub or restaurant on the banks.
I do not believe that the legislature intended for this situation to evolve. I can only hazard a guess as to where the blame should fall. My concern is that there is no other time but the present to begin a remedy. With deference, the majority still leaves the questions up in the air. The laws as applied to the record before this Court are clear. I think this Court is obligated to make the decision. The only positive decision the majority makes is to reverse and render here the lower court's holding that the tax levies of the counties should be used only for the retirement of bonds. If we think it should be used for anything other than subsidizing a city, I think we should spell out those uses and certainly they should not exceed the expenses of operating and maintaining the original project; that is, the reservoir and not a surrounding city. We surely can take judicial notice that the cost of acquiring and constructing the reservoir has long ago been paid.
I would make the specific holding here that certain statutes have been violated and would require an accounting, as is required of other subdivisions of the state. I would not complicate the judicial process by starting the whole thing over with another lengthy and costly hearing before the chancellor. I would make an effort to adjudicate here what needs to be done as indicated in the dissenting opinion of Justice Hawkins.
NOTES
[1] One of the primary purposes of the Reservoir was for flood control according to the legislative determination and declaration of policy. Miss. Code Ann. § 51-9-103 (1972).
[2] It is evident from the record that a disproportionate amount of these expenditures are incident to the residential development upkeep, maintenance, police protection, etc., and have no relationship to the primary purposes for which the Reservoir District was created. Miss. Code Ann. § 51-9-103 (1972).
[3] Section 51-9-135 provides that no bonds shall have a longer maturity than forty (40) years from January 1, 1961. This would make the last bond mature no later than January 1, 2001 and would terminate the State tax levy (section 51-9-131) and the authority for the special tax levy (section 51-9-139).
[4] The term "operation and maintenance" does not encompass permanent improvements or capital expenditures.
[5] In determining the gross revenues coming into the hands of the District, exclusive of sums from the special levy, the Act is clear that there should be taken into consideration all moneys coming into the hands of the District from any and all sources without exception. The Act does not provide for "special funds" such as the "Property Improvement Fund" set up by the District to be deducted from the gross revenues before determining the need for the special levy. It is true that there was a period of approximately one year from March 1973 until June 1974 that section 51-9-140 provided that estimated costs of planning and construction of improvements of public benefits on the shoreline of the project and within the project not to exceed $350,000 during any one year, were to be deducted from the gross revenues prior to determining whether the "special levy" provided for in section 51-9-139 could be requested and levied. However, that statute (section 51-9-140) contained an automatic repeal clause effective March 1973 and is no longer in effect.
[1] Justices Bowling, Prather, and Robertson (in alphabetical order) joined in this dissent. Justice Bowling wrote an opinion joining the dissent.
[1a] The study is Exhibit G-1, entitled "Studies of the Pearl River Valley Reservoir" (1957).
[2] This study is in two volumes, Exhibits G-2A and G-2B, entitled "Project Planning Report Pearl River Valley Reservoir on the Pearl River in Mississippi" (1959).
[3] The study is in two volumes, Exhibits G-3A and G-3B, entitled "Shoreline Development Study, Pearl River Valley Reservoir" (1961).
[4] There are actually two bond issues and two trust indentures. The 1964 bond issue refunded earlier bonds, and the 1964 trust indenture was almost identical with a 1959 trust indenture. For purposes of this opinion, we are only concerned with the bond issue and trust indenture in 1964.
[5] As part of the agreement by the District to maintain a reservoir which would meet all needs of the City of Jackson, the District and Jackson entered into a contract whereby the city would pay the District $500,000 annually for as long as any bonds were issued and outstanding, the first payment in 1960. Thus far, Jackson has had no need to call on the District for any of its water supply. Also, the contract requires the District to adhere to the provision of the trust indenture in the handling of all income and expenditures. The city is not a plaintiff, however.
[6] "Project" is defined as "the construction of an earth-filled dam across the channels of the Pearl River and Pelahatchie Creek, including related facilities," as set forth in the engineers' 1959 study.
[7] The state has historically collected an ad valorem tax of two mills from each county in the state. Under the Act, the tax is paid to the District. By Miss. Code Ann. § 27-39-317, there is authority for other counties in the state to likewise direct this two mill tax levy otherwise due the state to regional public uses, such as junior colleges, roads and bridges, or other specified uses.
[8] On May 3, 1968, the attorney general's opinion was sought by the District as to whether it could budget public funds for, and call upon the counties in the special levy to levy sufficient funds to also pay for the Shoreline Development Fund expenditures, as provided in the indenture. The attorney general replied by letter of May 6, 1968, that such expenditures were authorized. No opinion was expressed concerning the special levy.
[9] The $500,000 per year income to the District was what appealed to the engineering firm in its 1959 study.
[10] Indeed, the general manager of the District from 1959-1975, and its consulting engineer thereafter, testified he never recalled a study being made while he was manager to determine whether water and sewer rates were adequate to defray actual costs.
[11] The tourists and visitors to the lake was anticipated to yearly run into the millions.
[12] At trial in June, 1982, it was shown the District planned to start putting the monthly sewerage charges into the Revenue Fund in November, 1982, just as it has been doing with the water and garbage fee. The District officers expressed no intention of repaying to the District from the Property Improvement Fund the $493,396 it had already collected in sewerage fees, and which belong to the Revenue Fund.
[13] In March, 1977, the District paid $33,000 for a garbage truck, and in 1979 $41,500 for another. This illustrates the adequacy of $20,000 a year charge to the lessees.
[14] Hensley-Schmidt, Inc., "Pearl River Valley Water Supply District Metropolitan Area Rate Study, Water, Sanitary Sewerage and Solid Waste" (November, 1981)
[15] The wider range in sewerage would result in whether the Board continued the sewerage at 50 per cent of water rates or increased until it was the same as the water rates.
[16] What "transportation" means in the report is not clear. It is not a large expense, and is perhaps mileage to the officers going to and from work, for which some mode of allowance is made.
[17] Shop repair and maintenance for equipment in 1969, $86,227; in 1981, $362,511. No charge to the lessees for this category, either.
[18] The figure 4,000 appears in the Budget Requests for the fiscal years ending 1979 and 1980. For the fiscal year ending 1981, the figure is increased to 4,200 and for the fiscal year ending 1982, it is increased to 4,500. For the fiscal year ending 1983, it is increased to 5,000. Except for the change in figures, the language is the same in the five budget requests.
[19] It was really worse than stated, because the sewer charges never reached the Revenue Fund, where they might have been used for general operating expenses, but went instead into the Property Improvement Fund. Scratch another $145,000.
[20] It should be borne in mind the counties in this suit asked for an accounting. They did not get it. They did put on enough proof to show they were entitled to it. It was not the task of the counties to show all money which had been spent without statutory authority.
[21] This is not to be confused with interest received by the Property Improvement Fund by investment of its surplus funds.
[23] The taxpayers of the five counties may wish to tour the District and observe what wonders in public facilities their $4.4 million have wrought.
[24] Commingling occurs when a person occupying a position of trust with another's money spends it in such a way that it is impossible to tell the amount of the money expended for a proper purpose, and the amount expended for an improper purpose. This leaves the trustee free to claim the money was spent any way he desires to assert. Thus, in this case we have the District's officers (not knowing in fact how much they cost), solemnly testifying that the subdivision street maintenance was negligible and the fire and police protection for the subdivision was a minor cost. Also, as to the Property Improvement Fund, to claim no "tax money" is used by it.
[25] Conflict of interest occurs when a person charged with looking after the interest of A and B is faced with an option whereby if he makes one choice it will of necessity hurt A and help B, and if he makes the other choice he will of necessity help B and harm A. Obviously, he cannot serve them both equally well. Matthew 6:24 (KJV) speaks to this: "No man can serve two masters: for he will hate the one and love the other; or he will hold to the one, and despise the other ..."

The conflict of interest is even worse if the trustee himself happens in such circumstances to be either A or B.
[26] While it is true that the original special levy was two mills, and has been gradually reduced so that in 1981 it was 1.25 mills, the income from the counties under the special levy has increased.
[27] Their brief lists many more instances of probable wrongful expenditures than are set forth in this dissent.
[28] The District has consistently favored the desires of residents as opposed to all other interests. For example, it is constructing a $250,000 fire station, community center and library within the subdivision area, but at least one and one-fourth miles further from the public buildings of the District, which should be the main objects for fire protection.
[29] While it has been the stated goal of the District officers for the District to be self-sustaining, no realistic plan was ever adopted to achieve this. The engineer's report of 1981 was of the opinion the income from the leases would have to be quadrupled for them to pay one-half of the operating overhead by 1999. The so-called "goal" is no more than a pipe dream. The District has been a real estate developer's dream.

While this dissent may appear to have little concern for the lessee homeowners, their problem would quickly become acute if the coin were reversed and they indeed expected by taxes and assessments to substantially defray the cost of operating the entire District. Yet, this is precisely what the District officers state their goal to be. My view is that the lessees will be better served over the long term if their affairs with the District are put on a sound financial basis.
I am also glad to observe that I have no doubt the District officers and directors have meant well. This melancholy tale reveals once again that good intentions do not guarantee either wisdom or good results.
Finally, this dissent has been written by a judge without any administrative assistance in either the analysis of the record or exhibits, or in legal research. Although I have tried to be accurate, there may be some figures or statements of facts with which the parties will disagree. Such discrepancies, if they exist, will not change the panorama.